COMMONWEALTH *vs.* THOMAS LEONARD.

Middlesex.    Nov. 23, 1885. — Jan. 8, 1886.    DEVENS & GARDNER, JJ., absent.

An indictment, containing three counts, alleged in each count that certain articles, the property of a corporation named, were stolen; and that afterwards the " goods, chattels, and property aforesaid, so as aforesaid feloniously stolen," were feloniously received by the defendant, he knowing the same to have been stolen. *Held,* that the articles in each count alleged to have been feloniously received were the articles in that count alleged to have been stolen.

At the trial of an indictment against a licensed junk-dealer for receiving stolen goods, it appeared that, at the time the goods were discovered, the defendant did not keep a book containing a record of his purchases, as required by the Pub. Sts. c. 102, § 29. An inspector of junk-shops was allowed to testify that, some months before, he went to the defendant's shop to see whether he should receive a new license, and asked the defendant whether he kept such a book as the law requires of junk-dealers, and he said that he had not; that the witness told him he must do so, and, if he did not, he should report against his receiving a new license; and that the defendant then promised to keep a book. *Held,* that the defendant had no ground of exception.

At the trial of an indictment for receiving stolen goods, the defendant is not entitled to have the jury instructed that, " to justify a conviction, it is not sufficient to show that the accused had a general knowledge of the circumstances under which the goods were stolen, unless the jury are also satisfied that he knew that the circumstances were such as constituted larceny."

Since the Gen. Sts. c. 115, § 5, providing that courts shall not charge juries with respect to matters of fact, but may state the testimony and the law, it is erroneous in a criminal case to instruct the jury that evidence of character can only be considered by the jury where the other evidence is doubtful, and that it is not of the slightest consequence where the evidence is strong, and the guilt of the defendant is impressed on the minds of the jury.

INDICTMENT in three counts.    The first count alleged, that on July 1, 1883, certain articles, the goods, chattels, and property of

the Boston and Lowell Railroad Corporation, were feloniously stolen, and that the defendant afterward, on the same day, "the goods, chattels, and property aforesaid, so as aforesaid feloniously stolen, taken, and carried away, feloniously did receive and have, and did then and there aid in the concealment of the same," he "well knowing the said goods, chattels, and property to have been feloniously stolen, taken, and carried away."

The second and third counts were similar in form, but the property was in each differently described, and at a different date, namely, on August 1, 1883, and September 1, 1883, respectively.

In the Superior Court, before the jury were empanelled, the defendant moved to quash the indictment, "for the reason that no crime or offence is fully and plainly, substantially and formally described therein; in that it sets forth three distinct allegations of larceny, but does not clearly state whether there were one, two, or three receivings of the articles alleged to have been stolen, each allegation of feloniously receiving referring to all the preceding articles mentioned in the several allegations of theft." This motion was overruled; and the defendant excepted.

At the trial before *Brigham*, C. J., the evidence for the government showed that certain old material, iron, and metals, such as are mentioned in the indictment, having been stolen from the Boston and Lowell Railroad Corporation, were afterward, on August 29, 1883, found in the shop of the defendant, who was a licensed junk-dealer in Cambridge.

James McCarty, a witness for the government, testified that he was in the employ of the Boston and Lowell Railroad Corporation a number of years; that, for a long period before August 29, 1883, while in such employ, he had been in the habit of appropriating iron and other materials of the corporation which were taken from old cars in the repair shop, and selling the same to the defendant; and that the defendant induced him to procure them for him.

This witness was indicted in said county for the larceny of said property, forfeited his recognizance, and his sureties have been sued, which suit is now pending. After default and suit, he has come into court and pleaded guilty to the indictment, but has never been sentenced.

Two police officers, Murray and Moore, testified, for the government, that they went to the defendant's junk-shop on said August 29, and learned from him that he had no book as required to be kept by junk-dealers; that, with two other persons, employees of said corporation, they found there a considerable quantity of old iron, among which was the property described in the third count of the indictment; and that the property so described was taken away and restored to said corporation. A small portion of the property thus taken was positively identified as belonging to said corporation, and the remainder resembled property which belonged to it.

The two police officers also testified that the defendant, when asked where he obtained the property taken away, replied that he bought it of a man on the street whom he did not know; that he lived on Third Street, and he did not know his name; but that he finally said, on being pressed, that his name was McCarty, and that he worked on the Boston and Lowell Railroad.

Against the objection of the defendant, officer Murray was permitted to testify that, as inspector of junk-shops, which office he then held, in May, 1883, he went to see the defendant at his shop in regard to whether he should receive a new license, and then asked him whether he kept a book, such as the law requires of junk-dealers, and he said that he had not; that he, Murray, told him he must do so, and, if he did not, he should report against his receiving a new license; and that the defendant then promised to keep a book, and Murray reported in his favor, and he had a new license granted him.

The defendant testified that he bought the property of McCarty, but that he honestly did so; that he had known McCarty by sight for a long time before he bought anything of him; that he saw him frequently pass his premises on his way to work, but did not know where he was employed; that he knew he lived near by, on Third Street; that McCarty took him to his house, and showed to him there the first lot sold him, telling him in explanation that he bought it, attached to wood, as old material, pointing out to him the wood, which was broken and piled up as fire-wood, and saying that he had opportunities of purchasing such old material. He further testified, that there was nothing he purchased of McCarty but what junkmen usually deal in

and have, and the property in itself would excite no suspicion if presented for sale to a dealer in junk; that he was sixty-two years old; that he had lived in Cambridge twenty-four years, and was engaged in the junk business all that time there, receiving a license each year; that he had a family, and was a real-estate tax-payer; that he did not say to the officers that he did not know of whom he bought the property, and that, on the contrary, he told them at once, without hesitation, that he bought it of McCarty; that he gave the officers information where McCarty lived; and that, when McCarty was afterwards arrested by these officers, he identified him at the police station as the man of whom he bought.

Two witnesses, large wholesale dealers in junk in the city of Boston, testified, for the defendant, that the prices paid to McCarty were fair market prices for the material when purchased, and more than such was now worth; that such property was commonly found in junk-shops and dealt in by junk-dealers; and that, while the offering of a single spring for sale by a stranger might be suspicious, the offering of a quantity of this material, by one known to the dealer, would excite no suspicion that it had been dishonestly obtained.

None of the property was produced in court by the government, but certain coil springs and an elliptic spring were shown in court by the defendant, which were junk, and had come from the junk-shop of one of the wholesale dealers mentioned; and the witnesses for the government in the employ of said railroad admitted that these were good samples of, and in as good condition as, the property bought of McCarty.

The defendant introduced the testimony of many respectable witnesses, all of whom were old residents of Cambridge, and had lived and done business very near to the defendant, some upon the same street with him, and had known and seen him and those who knew him almost daily for many years. Among these were the chief of the state police, aldermen and ex-aldermen, and members of the council and of the legislature. All of these witnesses testified to the uniform good character of the defendant.

The defendant asked the judge to instruct the jury as follows: " 1. If the jury are not satisfied beyond a reasonable doubt that

the accused knew that the goods were stolen, he is entitled to an acquittal.     2. To justify a conviction, it is not sufficient to show that the accused had a general knowledge of the circumstances under which the goods were stolen, unless the jury are also satisfied that he knew that the circumstances were such as constituted larceny.     3. Good character, like all other facts in the case, should be considered by the jury, and if therefrom a reasonable doubt is generated in the mind of the jury as to the guilt of the accused, it is their duty to acquit."

The judge refused to give these instructions, and, upon the matters embraced therein, instructed the jury as follows:

" When a man is put on trial charged with a criminal act, he has a right to put in evidence the reputation which he has from those who know him, his character in other words, by way of rebuttal of the inference that he might be likely to commit the act of which he is accused; if a person is charged with any act which implies dishonesty, he has a right to put in his reputation of being an honest man in order to furnish evidence that the character of the man accused is such that one would not be likely to expect crime to be committed by him.   Character may properly be thrown into the scale to increase any reasonable doubt that the jury might have on the case in question; of course character is no excuse, a good name is no answer against decisive evidence; it is in a case where the evidence is doubtful, and the mind of the jury is in doubt, that the evidence of good character is thrown into the scale in behalf of the man; of course, if a man should come before a jury, a credible witness, and say he saw the accused party commit a crime, it would be no answer for that party to say 'my character has always been good.'   It is important, where the evidence to convict is doubtful, that it should be thrown into the scale in his favor, but where the evidence is strong, and his guilt is impressed on the minds of the jury, of course it is not of the slightest consequence.

" He must know that the goods were stolen, but he does not need to know the hour nor day they were stolen; he must undoubtedly have notice which would put him on his guard as knowledge that the goods were acquired and turned over to him by a person not taking them by mistake, not by right,

but taking them as thieves take them, that is, for the purpose of defrauding the railroad and cheating them out of their property."

The defendant's counsel here suggested, "by larceny," and the judge gave this further instruction:

" By the taking and carrying away of property, it is the fraudulent taking away of the property of another for the purpose of converting it to the taker's use to deprive the owner of it. These goods must have been taken that way, and were stolen goods; they must have been taken by McCarty as thieves take them, not by mistake or accident, or by taking from those who had no right to give, but taking when he knew that he had no right to take them."

The jury returned a verdict of guilty on the third count, and of not guilty on the other counts; and the defendant alleged exceptions.

*C. J. McIntire & G. A. Perkins*, for the defendant.

*E. J. Sherman*, Attorney General, and *H. N. Shepard*, Assistant Attorney General, for the Commonwealth.

FIELD, J.   The motion to quash was rightly overruled. The articles in each count alleged to have been feloniously received are the articles in that count alleged to have been stolen.

As testimony was introduced that the defendant did not keep a junk-dealer's book, the testimony of Murray was competent for the purpose of showing that the defendant knew that the statutes of the Commonwealth and the ordinances of the city of Cambridge required him to keep such a book.   See Pub. Sts. *c.* 102, § 29.   If the defendant intentionally neglected to keep a book which was required by law manifestly for the purpose of tracing all articles purchased by him as a junk-dealer, the fact was competent to be considered by the jury.

The offence of receiving stolen property, knowing it to have been stolen, must be considered as distinct from the offence of receiving embezzled property, knowing it to have been embezzled, Pub. Sts. *c.* 203, §§ 48, 51, although embezzlement under our statutes has been held to be a species of larceny.   *Commonwealth* v. *Pratt*, 132 Mass. 246.   The punishments of the two offences may be different, as the offence of receiving embezzled goods may be punished by a fine without imprisonment.   If the

property had actually been stolen, a belief on the part of the defendant that it had been stolen is tantamount to knowledge. If the defendant knew all the facts, and the facts constituted larceny, as distinguished from embezzlement, it would be no defence that the defendant thought that the facts constituted embezzlement. If the defendant did not know the facts, but believed, from the circumstances, that the property had been either embezzled or stolen, and it had been actually stolen, it was competent for the jury to find the defendant guilty of the offence charged. The second request for instructions was therefore rightly refused.

The first request for instructions states the law with substantial correctness. It is contended that the instructions given on this point, rightly construed, are the same in effect. We find it unnecessary to decide whether the case called for a more careful definition of larceny, as distinguished from embezzlement, or from wilful trespass.

. The third request was, we think, a correct statement of the law as it must now be held in this Commonwealth. The case was peculiarly one where evidence of the defendant's general reputation for honesty in his business deserved consideration. Such evidence is always competent in the trial of offences of this character. It is not now the law, we think, that evidence of character can only be considered by the jury where the other evidence is doubtful, and that "it is not of the slightest consequence" where the other "evidence is strong," and the guilt of the defendant "is impressed on the minds of the jury."

In *Commonwealth* v. *Hardy*, 2 Mass. 303, 317, it was said that, "in doubtful cases, a good general character, clearly established, ought to have weight with a jury; but it ought not to prevail against the positive testimony of credible witnesses;" and in *Commonwealth* v. *Webster*, 5 Cush. 295, a distinction was taken between crimes "of great and atrocious criminality" and "smaller offences," and it was said that "against facts strongly proved good character cannot avail," and that, in the smaller offences, such as "pilfering and stealing, where the evidence is doubtful, . . . . proof of character may be given with good effect." Both these decisions were before the Gen. Sts. c. 115, § 5, (Pub. Sts. c. 153, § 5,) which provided that "the courts shall not charge

juries with respect to matters of fact, but may state the testimony and the law."

The distinction taken in *Commonwealth* v. *Webster*, if it be regarded as matter of law, has been expressly disapproved of in *Cancemi* v. *People*, 16 N. Y. 501; *Harrington* v. *State*, 19 Ohio St. 264; and *People* v. *Garbutt*, 17 Mich. 9.

The old rule, that evidence of the good character of the defendant is not to be considered by the jury unless the other evidence leaves their minds in doubt, has been much criticised, and the weight of authority is now against it. 1 Bish. Crim. Proc. (3d ed.) §§ 1115, 1116. 3 Russ. Crimes, (5th ed.) 391. 3 Greenl. Ev. § 25. Whart. Crim. Ev. (9th ed.) § 66. *Stewart* v. *State*, 22 Ohio St. 477. *People* v. *Ashe*, 44 Cal. 288. *State* v. *Henry*, 5 Jones (N. C. ) 65. *Remsen* v. *People*, 43 N. Y. 6. *State* v. *Lindley*, 51 Iowa, 343. *Heine* v. *Commonwealth*, 91 Penn. St. 145. *State* v. *Daley*, 53 Vt. 442. *Coleman* v. *State*, 59 Miss. 484. *Cancemi* v. *People*, *ubi supra*. *Harrington* v. *State*, *ubi supra*. *People* v. *Garbutt*, *ubi supra*.

If evidence of reputation is admissible at all, its weight should be left to be determined by the jury in connection with all the other evidence in the case. The circumstances may be such that an established reputation for good character, if it is relevant to the issue, would alone create a reasonable doubt in the minds of the jury, although without it the other evidence would be convincing. To instruct a jury, that they are first to consider the other evidence in the case, and that, if they are thereby convinced beyond a reasonable doubt of the guilt of the defendant, they are to disregard the evidence of good character, and that they are only to consider this evidence when their minds are left in doubt by the other evidence, and when perhaps the defendant does not need the evidence of character for his acquittal, is a practice that finds even less support in reason than in authority.

The old practice of charging juries, that evidence of character was of little or no weight, except in doubtful cases, undoubtedly grew up when judges were accustomed to express their opinions to jurors upon matters of fact, and the weight to be given to evidence, and was perhaps sufficiently just in particular cases; but we think it ought not to have been made a rule of universal

application, that is, a rule of law; and, since the passage of the Gen. Sts. *c.* 115, § 5, it is open to the objection that it is charging juries upon the weight to be given to evidence, when the law, in our opinion, does not define the degree of weight to be attached to it.                    *Exceptions sustained.*